**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

VASYL MICHAEL HARIK, *

Plaintiff, *

v. * Civil Action No.: AW-05-1182

THOMAS L. WILSON, et. al., *

Defendants. *

* * * * *

**MEMORANDUM OPINION**

Plaintiff Vasyl Michael Harik ("Harik" or "Plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, against his former employer, Swales Aerospace, Inc. ("Swales" or "Defendant"). Specifically, Harik alleges the following claims: (1) hostile work environment; (2) discriminatory discharge; and (3) retaliatory discharge for opposing alleged unlawful employment actions by a NASA employee. Currently pending before the Court is Defendant's Motion for Summary Judgment [39]. The Court has reviewed the entire record, as well as the pleadings with respect to the instant motion. No hearing is deemed necessary. See Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are taken in the light most favorable to Plaintiff. Harik, an immigrant from Ukraine, began his employment at Swales in June 2002. Prior to that time, Harik worked as a staff scientist at the ICASE Institute ("ICASE"). While employed at ICASE, Harik worked at NASA's Langley Research Center ("Langley") and was assigned to a work group managed by Dr.

Thomas Gates ("Gates"), a NASA employee.

According to Harik, his relationship with Gates began to deteriorate a few months after his arrival at Langley. Gates often corrected Harik's pronunciation of words, and on one occasion, Gates said his classification of nanotubes was "useless" and referred to nanotubes as "bourgeois" and "proletariat." In addition, Harik claims that internal NASA procedures regarding the approval process for publications caused delays in the publication of his work.

Harik reported the incidents to his supervisor at ICASE and attempted to resolve the issue of publishing his work with Gates' supervisor, Dr. Ambur ("Ambur"). Although Harik's ICASE supervisor investigated this problem, ICASE was unable to resolve Harik's problems with Gates to Harik's satisfaction. Ambur recommended that Harik seek employment with Swales Aerospace, which administered the Systems Analysis and Mission Support ("SAMS") contract. Dr. Swales hired Harik as a senior structural engineer in June 2002.

When Harik joined Swales he received a copy of Swales' Policies and Procedures Ethics Manual ("Manual"), which established the procedure for employees to register complaints. The Manual specified that an employee could lodge a complaint with the employee's supervisor, any company officer, or with Human Resources. The Manual also stated that an employee may be terminated for "gross misconduct such as insubordination."

In his new position, Harik continued to work at Langley part of the time. At Swales, Harik reported directly to John Mitchell ("Mitchell") and his deputy Vaughn Behun. Harik's research for the SAMS and University Research, Engineering and Technology Institute ("URETI") projects at NASA was no longer managed by Gates, but by Ambur.

Although Gates did not directly supervise Plaintiff at Swales, Plaintiff claims Gates

continued to make disparaging comments to Plaintiff. In particular, at a meeting in August 2003, Gates discouraged Plaintiff from making a presentation and accused Plaintiff of presenting someone else's work. In addition, Plaintiff has stated that Gates refused to provide him access to ANSYS Multiphysics updates, software that he needed to perform his job.

In September 2003, Harik made a safety report to Mitchell, stating that he believed that his work space at NASA was contaminated with "microdust" or "irritant aerosols." An investigation by Mitchell and a NASA safety official did not reveal the presence of any contaminants in Harik's work environment. Harik believes that Mitchell began treating Harik dismissively and with contempt towards his complaints after his September 2003 safety report.

Starting in December 2003, Harik repeatedly called in sick. In December 2003, Harik used 112 hours of sick leave and worked 72 hours. In January 2004, Harik worked 19 hours and used 157 hours of sick leave. In February, the Swales Human Resource Manager Pam Butziger ("Butziger") met with Harik about Harik's use of sick leave. Butziger suggested that Harik apply for disability. Harik began using his vacation time to cover absences from work after he depleted his sick time.

During the same meeting, Harik formally notified Butziger about his problems with Gates. In response, Swales immediately moved Harik from the NASA facility to a Swales building. Andrew Srokowski ("Srokowski"), the Swales program manager for the SAMS contract, and Mitchell initiated an investigation by interviewing Ambur and other witnesses about any interaction between Gates and Harik. The witnesses did not confirm Harik's allegations of mistreatment by Gates.

On March 10, 2004, Srokowski met with Harik and assured him that he would speak to Ambur and that Harik would have access to the ANSYS software at Swales facilities. Also, Srokowski informed Harik that he might have to work on a part-time basis if he continued to work

the same amount of limited hours once he depleted his vacation time.

Harik sent Srokowski an email on March 19, 2004, stating that Srokowski's proposed action was "not sufficient," and accusing Srokowski of being "belittling" and "derogatory" towards him and his complaints regarding Gates. Harik then informed Srokowski that he had initiated a complaint with NASA's Equal Employment Office ("EEO"). Harik also requested permission to telecommute.

Srokowski replied that afternoon to Harik's email, denying Harik's request to telecommute and instructing Harik to meet with him on Monday, March 22, 2004, with a written report of his work activities. Harik did not reply to this email or meet with Srokowski on March 22, 2004.

Srokowski sent another email on Wednesday, March 24, 2004, instructing Harik to meet with him at 9:30 a.m. on Monday, March 29, 2004, with the written report Srokowski previously requested. Harik replied to this email at 9:07 a.m. on March 29, 2004 with a copy of his monthly report on the SAMS contract, stated that if Srokowski had any questions he would respond via email, and informed Srokowski that he was resigning from the SAMS task. Harik did not meet with Srokowski on March 24, 2004.

Srokowski responded to Harik's email on March 30, 2004, by asking if Harik was refusing to meet with him and noting that he wanted a report of all of Harik's work, not just a report of his activities on the SAMS contract. Srokowski further requested a complete report by the close of business on March 30, 2004.

On April 1, 2004, Harik responded to Srokowski's emails by stating:

> This bombardment of a contractor employee by the managerial-muscle-flexing emails from the level 3 manager is not only a bad example of micro-management, but it also further promotes the hostile work environment. You weave into my daily routine the handling of these emails, hostile questioning, and force on me meetings involving disrespectful conduct.

> If you cannot help to resolve the RCD task-relevant problems then, please, don't disrupt the current URSA task.

Harik also accused Srokowski of being a "belittling manager who avoids dealing with problems in an impartial manner." Harik stated that if Srokowski "can not be a part of constructive [sic] solution, then he should avoid being or creating a problem."

When Srokowski received the email he immediately spoke with Butziger, and the two of them agreed that the tone of Harik's email was insubordinate and that Harik's actions warranted termination.

Harik was called in for a meeting with Mitchell, during which Mitchell gave Harik a letter of termination. The letter summarized the reasons for Harik's termination, including his use of sick leave and his conduct towards his managers.

Harik then filed a discrimination charge with the EEOC on October 14, 2004. On January 31, 2005, the EEOC found that it was unable to conclude that a Title VII violation had occurred. Harik subsequently filed suit in this Court on May 2, 2005.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material facts exists and the moving party is entitled to a judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Haavistola v Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993); Etefia v. East Baltimore Comm. Corp., 2 F. Supp. 2d 751, 756 (D. Md. 1998). In a motion for summary judgment, the moving party discharges its burden by showing an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). The court must "draw all justifiable inferences in favor of the non-moving party, including questions of

credibility and the weight to be accorded to particular evidence." Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991) (internal citations omitted). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

To defeat a motion for summary judgment, the non-moving party must come forward and show that a genuine issue of material facts exists. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. See Deans v. CSX Transp., Inc., 152 F.3d 326, 330-31 (4th Cir. 1998); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). A mere scintilla of evidence is not enough to create a fact issue. See Barwick v. Celotex Corp., 736 F.2d 946 (4th Cir. 1984).

**DISCUSSION**

Plaintiff alleges that he was subjected to a hostile work environment and discriminatorily discharged on the basis of his national origin. In addition, Plaintiff claims his discharge was in retaliation for filing an EEO charge against NASA. Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer . . . to fail to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, any unlawful employment practice. 42 U.S.C. § 2000e-3(a).

Plaintiff presents no direct evidence that Defendant intentionally discriminated against him

on the basis of his national origin or that he was discharged in retaliation for filing a complaint against NASA, so he relies on the burden-shifting method of proof established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under the McDonnell Douglas framework for proof, a plaintiff has the initial burden of establishing a prima facie case of discrimination. See id. at 802. If the plaintiff establishes a *prima facie* case of discrimination or retaliatory discharge, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for taking action against the plaintiff. See McDonnell Douglas, 411 U.S. at 802. If the defendant can articulate a non-discriminatory rationale for the adverse action against the plaintiff, the plaintiff then is afforded the opportunity to show that the defendant's rationale was in fact a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804.

I. Hostile Work Environment

Plaintiff alleges that Defendant created a hostile work environment by: not reprimanding Gates, a NASA employee, for making comments about Plaintiff's Ukrainian ancestry; not providing ANSYS software; not publishing some of Plaintiff's work; denying Plaintiff opportunities to attend conferences; and by allowing Swales employees to "snub" him. Pl.'s Compl. at 2-3. To establish a *prima facie* Title VII claim of a hostile work environment, Plaintiff must show that: (1) the harassment was unwelcome; (2) he was harassed because of a protected characteristic; (3) the harassment was sufficiently pervasive to alter his terms and conditions of employment and created an abusive working environment; and (4) some basis exists for imposing liability on the employer. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998); Hartsell v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir. 1997).

Parties appear to agree that Plaintiff can demonstrate the first element and third elements of

a hostile work environment claim -- that the harassment was unwelcome and that the harassment was sufficiently pervasive to alter the terms of Harik's employment. Def.'s Mem. at 21.

With respect to the second element, this Court finds a question of fact exists as to whether Plaintiff was harassed because of his national origin. Defendant's alleged conduct could constitute harassment on the basis of national origin, if Harik's national origin prompted the actions against him. See Baqir v. Principi, 434 F.3d 733, 746 n.15 (4th Cir. 2006) (noting that a protected trait can prompt discriminatory treatment). An employee is harassed or discriminated against "because of" his or her protected trait if, "but for" the employee's national origin he or she would not have been the victim of the discrimination. See Hartsell v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir. 1997). Because comments referencing "bourgeois," "proletariat," or "Russian" make little sense outside the context of Plaintiff's Ukrainian ancestry, a reasonable juror could find that Gates made these statements because of Plaintiff's national origin.

Plaintiff cannot avert summary judgment on his harassment claim, however, because the record provides no basis for imposing liability on Defendant. When determining whether an employer is liable for an individual's conduct, courts have looked to agency principles. See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) (applying agency principles to decide whether a company is liable for a supervisor's alleged harassment of an employee). "[A]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate . . authority over the employee." Mikels v. City of Durham, 183 F.3d 323, 331 (4th Cir.1999) (internal quotes omitted). In contrast, if the alleged harasser is not the employee's supervisory, the relevant inquiry is whether the misconduct was "aided by the agency relationship." *Id.* at 331-32. Applying these principles, courts have found that an employer may be

liable for the conduct of a non-employee if it fails, "after actual or constructive knowledge, to take prompt and adequate action to stop it." Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006) (quoting Mikels v. City of Durham, N.C., 183 F.3d 323, 332 (4th Cir. 1999)). Once presented with the existence of illegal conduct, "employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." Spicer v. Virginia, 66 F.3d 705, 711 (4th Cir. 1995).

While Plaintiff reported intermittent problems with accessing the ANSYS software to his superiors at Swales, he also stated that the access problems were being resolved, and he never claimed that he was intentionally denied access to any software. Def.'s Ex. 3. Also, Plaintiff did not mention any problems with Gates until the February 2004 meeting with Butziger. In response, Swales immediately moved Plaintiff to a Swales facility where Plaintiff would have no further contact with Gates. Furthermore, Plaintiff does not allege he was subjected to any further harassment after his removal from the NASA facility. Even viewing the evidence in the light most favorable to Plaintiff, this Court finds that Swales took prompt steps to end the alleged harassment.

As a result, this Court will grant summary judgment on the hostile work environment claim, finding no basis to impute knowledge of workplace misconduct to Swales.

II. Discriminatory Discharge

In addition to alleging a hostile work environment, Plaintiff claims that Swales terminated his employment based on his national origin. Pl.'s Compl. at 3. To prove a *prima facie* case of discriminatory discharge, Plaintiff must prove: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar

circumstances. See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995).

The parties do not dispute that Plaintiff meets the first and third elements of discriminatory discharge. Def.'s Mem. at 26.

Plaintiff, however, is unable to prove that he was qualified for his job and his job performance was satisfactory. To the contrary, the evidence establishes that he engaged in insubordinate behavior and routinely missed work. See Porter v. National Con-Serv, Inc., 51 F. Supp. 2d 656, 659 (D. Md. 1998) (holding that an employee could not prove his job performance was satisfactory when he was insubordinate to his superior and "missed a lot of work"). Plaintiff has offered evidence that in May 2003 he received a satisfactory review and continued to be an excellent worker until his termination in April 2005. The May 2003 review is not relevant because this review took place two years before Plaintiff's termination and before Plaintiff engaged in any alleged misconduct. Here, Srokowski's decision to terminate Plaintiff was triggered by Plaintiff's excessive use of sick leave, "resigning" from a project without permission, refusing to meet with Srokowski, and sending inappropriate emails to Srokowski, not his ability to perform certain tasks.

In addition, Plaintiff's failure to provide evidence that other employees of a non-protected group were retained while engaging in similar behavior further undermines his claim that he was the victim of discriminatory discharge. See Mungro v. Giant Food, Inc., 187 F. Supp. 2d 518, 523 (D. Md. 2002); Matthews v. Giant Food, Inc., 187 F. Supp. 2d 486, 489-90 (D. Md. 2002); Adams v. Giant Food, Inc., 225 F. Supp. 2d 600, 603 (D. Md. 2002). Plaintiff's claim for discriminatory discharge thus fails as a matter of law.

III. Retaliatory Discharge

Plaintiff contends that he was terminated in retaliation for filing a complaint with the EEOC

against NASA, which alleged discriminatory conduct based on his national origin. To establish a *prima facie* claim of retaliatory discharge, Plaintiff would have to show that: (1) he engaged in protected activity; (2) his employer took adverse employment action against him; and (3) a sufficient causal connection existed between his protected activity and his employer's adverse employment action. See Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996).

It is undisputed that Plaintiff can satisfy the second requirement of the *prima facie* case, because he was terminated. See Hartsell v. Duplex Products, Inc., 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action).

Defendant contends that Plaintiff's complaint against NASA was not a protected activity because Plaintiff cannot show that Swales terminated Plaintiff's employment in retaliation for lodging the complaint against NASA. Def.'s Mem. at 28. This Court cannot agree. An individual is protected against retaliation for initiating employment discrimination proceedings, even if those proceedings involve a different entity. See McMenemy v. City of Rochester, 241 F.3d 279 (2d Cir. 2001). Allowing an employer to avoid liability for terminating an employee who complains about discriminatory practices at an organization for which his employer requires him to work would violate the purpose of section 2000e-3. See Vasconcelos v. Meese, 907 F.2d 111, 113 (9th Cir. 1998) (stating that the purpose of section 2000e-3 "is to protect the employee who utilizes the tools provided by Congress to protect his rights"). Accordingly, by filing a complaint against NASA Plaintiff engaged in a protected activity.

Plaintiff cannot, however, establish a causal connection between his complaint about Gates' conduct and his termination by Swales. For Plaintiff to survive summary judgment, Plaintiff must "have evidence from which a reasonable fact finder could conclude that a causal connection exists

between the protected activity and the adverse action." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). To prove a causal connection between the protected activity of the employee and the adverse treatment by the employer, the employer must have "taken the adverse employment action *because* the plaintiff engaged in a protected activity." Id. (emphasis in original).

Although alleging an unlawful employment practice is protected conduct, Title VII does not shield an employee from discipline for violating the employer's rules or disrupting the workplace. See Haulbrook v. Michelin North America, 252 F.3d 696, 707 (4th Cir. 2001); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (holding that an employee was not terminated for making protected complaints, but for insulting and engaging in an angry outburst at a superior); Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999) (holding that an employee's insubordination was the cause for termination, despite employee's mention of a protected complaint during an argument).

In this case, the record reflects that Plaintiff was terminated for not complying with orders from his superior, Srokowski, rather than for filing an EEO complaint against NASA. While Plaintiff informed Defendant of his protected complaint against NASA in February 2004, Plaintiff was terminated in April 2004 only after Plaintiff refused to meet with Srokowski several times, refused to send Srokowski a requested report of his work activities, and sent Srokowski emails insulting Srokowski's managerial style. Plaintiff's insubordination severs the causal link between his protected activity and his termination, and Defendant is entitled to summary judgment on Plaintiff's retaliation claims. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (stating that "intervening unprotected misconduct eroded any causal connection that was suggested by the

temporal proximity of his protected conduct and his termination”).

IV. Pretext

Even if Plaintiff had stated a *prima facie* case of hostile work environment, discriminatory discharge, or retaliatory discharge, Plaintiff has not offered evidence to rebut Defendant’s legitimate, nondiscriminatory reason for his termination. Defendant has stated that Plaintiff was terminated for excessive use of sick leave, refusing to meet with a superior, ignoring requests from his superiors, and sending insubordinate emails.

Plaintiff argues that Defendant’s reasons for terminating him were pretextual because the decision to fire Plaintiff was made after his managers at Swales learned of his EEO complaint against NASA and during the review period for the SAMS contract with NASA. Pl.’s Mem. at 1, 5. Aside from his own bald allegations, Plaintiff has not provided any evidence that Swales’ knowledge of Plaintiff’s EEO complaint was the cause of his termination. Furthermore, Plaintiff has not presented any direct evidence to support this claim that NASA pressured Swales to retaliate against Plaintiff to obtain a favorable review of the SAMS contract. As such, Plaintiff has failed to show that the reasons given for Plaintiff’s termination were pretextual.

## CONCLUSION

For all of the aforementioned reasons, the Court will grant Defendant’s Motion for Summary Judgment [39]. An Order consistent with this Opinion will follow.

Date: August 22, 2006

/s/
Alexander Williams, Jr.
United States District Court